IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHESTLEY TURNER, STEPHANIE MCRANIE, and TURNER EXPRESS, LLC, ) ) ) ) | |
| Plaintiffs, ) ) | No. 21 C 5867 |
| v. ) ) | Judge Jorge Alonso |
| GAC STAR QUALITY, LLC, and GRIGORE CECATI, ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Chestley Turner, Stephanie McCrainie, and Turner Express, LLC ("Plaintiffs") have sued an automotive repair company, GAC Star Quality, LLC, and its proprietor, Grigoire Cecati (collectively "GAC"), for GAC's alleged failure to properly repair Plaintiffs' semi-truck. GAC has moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is granted in part and denied in part.

**I.    BACKGROUND**[1]

Plaintiffs Turner and McCrainie together operate Turner Express, LLC, a long-haul trucking business. (Second Am. Compl. ("Compl.") ¶¶ 14, 17, ECF No. 24.) Plaintiffs purchased the business's only truck, a 2007 Peterbilt 379 truck tractor ("Peterbilt"), in August 2020. (*Id.* ¶¶ 15, 18.) They earn approximately $1,000 to $3,000 per day by driving the Peterbilt cross-country. (*Id.* ¶ 16.)

---

[1]    The following well-pleaded factual allegations are accepted as true for purposes of the motion to dismiss. *See Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016).

The Peterbilt's engine broke down on October 3, 2020. (*Id.* ¶ 19.) Two days later, Plaintiffs took the Peterbilt to GAC, an auto repair shop in Lansing, Illinois, to have the engine examined. (*Id.* ¶¶ 6, 20.) Cecati, GAC's president, told Plaintiffs that GAC could repair the engine by the end of November, and Plaintiffs left the Peterbilt with GAC. (*Id.* ¶¶ 21–22.)

When Plaintiffs inquired about the Peterbilt in mid-October, Cecati told them that they would either need a new engine or an out-of-frame engine rebuild. (*Id.* ¶ 28.) Plaintiffs chose the latter option and requested a cost estimate, but GAC never responded to their request. (*Id.* ¶¶ 29–31.) Nor did GAC obtain a signed waiver of Plaintiffs' right to receive such an estimate. (*Id.* ¶ 32.)

A month later, McCrairie asked Cecati for an update on the status of the repairs, but Cecati never responded. (*Id.* ¶¶ 37–38.) After another two weeks, McCrairie again reached out to ask when the work would be done, and although Cecati responded this time, he was unable to provide a timeframe. (*Id.* ¶¶ 39–40.)

The same day, McCrairie asked GAC for an invoice because Plaintiffs still had not received a price quote. (*Id.* ¶ 42.) Cecati responded via text that the estimated cost of the out-of-frame engine rebuild was $18,000, but stated that he could not provide them with a formal invoice. (*Id.* ¶ 43.) The text message contained only the $18,000 figure and did not provide a breakdown of the costs, a description of the parts used, or a calculation of labor costs. (*Id.* ¶ 45.)

Due to the longer-than-anticipated repair time, in early December, Plaintiffs rented a Penske truck to continue operating their business. (*Id.* ¶¶ 55–57.) The rental fees and increased insurance payments because of the rental cost Plaintiffs more than $15,500 and $9,600, respectively. (*Id.* ¶¶ 118, 124.)

Nearly four months after they had left the Peterbilt at GAC, GAC notified Plaintiffs on January 21, 2021, that the Peterbilt was ready to be picked up, and sent Plaintiffs an invoice for $18,989.75. (*Id.* ¶¶ 61–62.) Five days later, Plaintiffs picked up the Peterbilt and paid $18,989.75 to GAC. (*Id.* ¶¶ 63, 65.)

Almost immediately, Plaintiffs again experienced problems with the Peterbilt. The check engine light turned on, and the Peterbilt began leaking oil from the front engine. (*Id.* ¶¶ 67–69.) The truck's left turn signal, defroster, and cruise control also malfunctioned. (*Id.* ¶ 74.) In mid-February, GAC told Plaintiffs to bring the Peterbilt back to their shop so they could fix the oil leak and the other issues. Plaintiffs did so, but many of the problems continued. (*Id.* ¶¶ 72–74.)

The Peterbilt's issues persisted over the next three weeks, which forced Plaintiffs to spend thousands of dollars on inspections, parts, and repairs. (*See generally id.* ¶¶ 86–102.) Then, on March 13, 2021, the Peterbilt broke down again in California. (*Id.* ¶ 103.) Because they were unable to complete their haul, Plaintiffs lost $6,900 in income. (*Id.* ¶ 104.) Plaintiffs again paid thousands of dollars for repair services to return the Peterbilt to working order. (*Id.* ¶ 108.)

All told, Plaintiffs estimate that GAC's faulty repairs have cost them $65,393.21 in actual damages. They filed this suit asserting five claims against GAC: (I) violation of the Illinois Automotive Repair Act ("Repair Act"), 815 ILCS 306/1 *et seq.*; (II) negligence; (III) breach of the implied warranty of workmanlike performance; (IV) negligent misrepresentation; and (V) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. Defendants have filed a Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim.[2] The Court addresses each claim in turn.

---

[2] Jurisdiction is proper over this action because the amount in controversy exceeds $75,000 and the parties are completely diverse. 28 U.S.C. §§ 1332(a)(1). Plaintiffs Chestley Turner and Stephanie McCranie allege that they are individuals domiciled in Ohio. (Compl. ¶¶ 3–4.) Plaintiff

3

**II.   LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal quotation marks omitted)).

When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and . . . draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (citation omitted). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

---

Turner Express LLC alleges that it is a limited liability company whose sole member and director is Plaintiff Chestley Turner, who is domiciled in Ohio. (*Id.* ¶ 5.) Accordingly, Plaintiffs are citizens of Ohio. *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007) ("[T]he citizenship of an LLC is the citizenship of each of its members."). Defendants are citizens of Illinois. (*Id.* ¶¶ 6–7.) Although Plaintiffs' claim for actual damages falls below the $75,000 amount-in-controversy requirement for diversity jurisdiction, 28 U.S.C. § 1332(a), courts must consider potential punitive damages awards in determining whether a party has cleared that threshold. *LM Ins. Corp. v. Spaulding Enters., Inc.*, 533 F.3d 542, 551 (7th Cir. 2008). In this case, the availability of punitive damages under the ICFA, *see* 815 ILCS 505/10a(a); *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1078 (7th Cir. 2019), and potentially for Plaintiffs' negligence and negligent misrepresentation claims, *see Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812–13 (7th Cir. 2017) (under Illinois law, punitive damages are available for tort claims upon a showing of gross negligence or wanton conduct), assures the Court of its subject-matter jurisdiction here. *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 731 (7th Cir. 2021) (federal courts have an independent duty to confirm that they have subject-matter jurisdiction).

statements." *Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (citations and internal quotation marks omitted).

III.     **ANALYSIS**

A.     **Repair Act Claim**

GAC moves to dismiss the Repair Act claim on grounds that the Repair Act contains no private right of action. Enacted to promote "improved communications and accurate representations between automotive repair facilities and their customers," 815 ILCS 306/5, the Repair Act imposes certain disclosure and transparency obligations on automotive repair facilities. As relevant here, these include a requirement that a covered facility "give to each consumer a written estimated price" for every repair that costs more than $100 before commencing the repair; that it provide oral or written notice to the consumer before charging for work that exceeds the estimated price by more than ten percent; and that it provide the consumer with "an estimate of the time necessary to complete the repair, if in excess of one working day." 815 ILCS 306/15(a)–(b). A covered facility must also notify the consumer and give them an option to pick up their vehicle from the facility if the facility is unable to complete the repairs within the estimated time. 815 ILCS 306/40.

The Repair Act contains no express private right of action. Instead, it provides that knowingly engaging in a "persistent practice or pattern" of conduct that violates the Act constitutes an "unlawful practice" under the ICFA. 815 ILCS 306/85. Such a violation empowers the attorney general to exercise "all remedies, penalties, and authority available" under the ICFA to enforce the Repair Act. *Id.*[3]

---

[3]     Some courts have interpreted the Repair Act to give rise to a private damages remedy under the ICFA. *See* 815 ILCS 505/10a (authorizing private damages suits for ICFA violations); *Montgomery v. Nostalgia Lane, Inc.*, 891 N.E.2d 994, 995 (Ill. App. Ct. 2008). But Plaintiffs here

Where a statute—like the Repair Act—contains no express private cause of action, a court may recognize an implied private right of action "if the underlying statute can be interpreted to disclose the intent to create one." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 164 (2008). To determine whether a statute contains an implied private right of action, Illinois courts apply a four-factor test, asking whether "(1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Metzger v. DaRosa*, 805 N.E.2d 1165, 1168 (Ill. 2004) (citation and internal quotation marks omitted). Illinois courts "will recognize an implied right of action in [the] statute only if the plaintiff demonstrates all four of those factors." *1541 N. Bosworth Condo. Ass'n v. Hanna Architects, Inc.*, 196 N.E.3d 1108, 1116 (Ill. App. Ct. 2021) (citing *Abbasi v. Paraskevoulakos*, 718 N.E.2d 181, 187 (Ill. 1999)), *appeal denied*, 187 N.E.3d 704 (Ill. 2022); *see also Patel v. Zillow, Inc.*, No. 17-CV-4008, 2017 WL 3620812, at *8 (N.D. Ill. Aug. 23, 2017) (finding no implied cause of action where plaintiff had not shown that statute's enforcement scheme would be inadequate absent an implied private cause of action), *aff'd*, 915 F.3d 446 (7th Cir. 2019).

Plaintiffs do not directly address the relevant test. They do, however, assert generally that the purpose of the Repair Act—to protect consumers of automobile repair services from being taken advantage of by providers of those services—could not be vindicated without allowing consumers to recover damages for violations of the Act.

---

have pleaded their Repair Act claim as a standalone cause of action, without any reference to the ICFA. (*See* Compl. ¶¶ 142–76.) And, in any case, Plaintiffs do not appear to allege a "pattern or practice" of Repair Act violations.

The Court disagrees. The Supreme Court of Illinois has stated that an implied private right of action exists "only in cases where the statute would be ineffective, as a practical matter, unless such action were implied." *Metzger*, 805 N.E.2d at 1170 (citation omitted). That is not the case here. The Repair Act designates repeat violations of its provisions as unlawful practices under the ICFA and imports the ICFA's expansive public-enforcement scheme to punish such violations. 815 ILCS 306/85; 815 ILCS 505/2Z. Under the ICFA, the state attorney general may subject Repair Act violators to injunctive relief, revocation of their business license, and civil penalties not to exceed $50,000 (a nontrivial amount for many auto repair businesses). 815 ILCS 505/7(a).[4] Because these remedies are more than adequate to accomplish the statute's regulatory objectives, no private right of action is needed. *See Metzger*, 805 N.E.2d at 1172 ("[W]hen a statute grants a state official broad authority to enforce the statute . . . it indicates the legislature's intent not to imply a private right of action for others to enforce the statute."); *1541 N. Bosworth*, 196 N.E.3d at 1121 (city ordinance regulating self-certification for building permits did not contain private right of action because section authorizing the city to issue "injunctions, abatement orders, or other remedial orders" for violations of the ordinance provided adequate deterrence (quoting Chi. Mun. Code § 13-12-2020)); *Patel*, 2017 WL 3620812, at *7 (real estate licensing act's "robust

---

[4] Plaintiffs also assert that "countless private lawsuits under [the Repair Act] have succeeded in Illinois courts." (Pls.' Resp. 4, ECF No. 28.) In support, they cite two Illinois appeals court decisions. (*See id.* at 4–5 (citing *Bell v. Ring*, 115 N.E.3d 395 (Ill. App. Ct. 2018) and *Montgomery*, 891 N.E.2d 994).) But neither case supports their claim that the Repair Act *standing alone* authorizes recovery of damages. Instead, both cases involve Repair Act claims that serve as predicate violations for private damages actions under the ICFA. *Bell*, 115 N.E.3d at 402 (finding the evidence "sufficient to show that defendant knowingly violated the Repair Act as necessary to establish an actionable violation under the [ICFA]"); *Montgomery*, 891 N.E.2d at 995 ("Count I alleges that defendant violated several provisions of the [Repair Act] and that those violations are actionable under section 2Z of the [ICFA] . . . ."). As already noted, *see supra* note 3, that is not what Plaintiffs have pleaded here.

enforcement scheme," which provided for injunctive remedies, criminal penalties, and a $25,000 fine per violation, made a private right of action "unnecessary").

Plaintiffs have not shown that the Repair Act's enforcement scheme would be inadequate absent a private right of action for damages. Accordingly, they have failed to establish that the Repair Act contains such a right. *See Abbasi*, 718 N.E.2d at 187. GAC's motion to dismiss the Repair Act claim is therefore granted. Count I of Plaintiffs' Second Amended Complaint is dismissed without prejudice.

**B.      Negligence Claim**

GAC next argues that Plaintiffs' negligence claim is barred by the economic loss rule,[5] known in Illinois as the *Moorman* doctrine after the seminal Illinois case *Moorman Manufacturing Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982). Under this rule, to recover damages in negligence for a product defect, the plaintiff must have suffered personal injury or property damage as a result of the defect. *City of Chi. v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1139 (Ill. 2004). Negligence claims for "solely economic loss" are barred because they "are best handled by contract, rather than tort." *Id.* (quoting *Moorman*, 435 N.E.2d at 450). *Moorman* defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits," and "the diminution in the value of the product because it

---

[5]      GAC also asserts that Plaintiffs' negligence claim fails because GAC did not owe Plaintiffs a tort duty independent of their contractual relationship with Plaintiffs. In response, Plaintiffs dispute the existence of any contract between themselves and GAC, and in the alternative, dispute the scope of any such contract. Because the economic loss doctrine bars Plaintiffs' negligence claim irrespective of the existence or scope of their contractual relationship with GAC, the Court need not address those arguments. *See Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986) (the economic loss rule applies "regardless of the plaintiff's inability to recover under an action in contract").

is inferior in quality and does not work for the general purposes for which it was manufactured and sold." 435 N.E.2d at 449 (citations omitted).

On first impression, the rule seems to foreclose Plaintiffs' negligence claim, because they merely seek to recover damages for various internal defects purportedly caused by the repairs (*see, e.g.*, Compl. ¶¶ 186, 190–93, 200, 207–08) and lost profits and expenses incurred as a result of the defects, including the cost of subsequent repairs, and the rental truck (*see, e.g., id.* ¶¶ 201, 204–05, 209–13).

Plaintiffs assert in response that their claim falls under the "damage to property" exception to the economic loss rule because they have pleaded that GAC's negligent repairs damaged the Peterbilt and Illinois law "permit[s] tort recovery for damage to the [defective] product itself." (Pls.' Resp. 10, ECF No. 28 (citing *Vaughn v. Gen. Motors Corp.*, 466 N.E.2d 195, 197 (Ill. 1984), *overruled by Trans States Airlines v. Pratt & Whitney Can., Inc.*, 682 N.E.2d 45 (Ill. 1997)).) The case on which they rely, however, has been overruled by the Supreme Court of Illinois on precisely this ground—Illinois law is now clear that, to escape *Moorman*'s rule, the property damage must be to property *other* than the defective product.[6] *See Trans States*, 682 N.E.2d at 54–55 (overruling *Vaughn*'s holding that damage caused by a defective product is recoverable where the damage is

---

[6] Elsewhere in their response brief, Plaintiffs shift a little and seem to argue that the damage to the Peterbilt *is* damage to other property for purposes of the economic loss rule because the defective product was the rebuilt engine, not the entire truck. (Pls.' Resp. 8–9.) That argument also fails because Illinois law treats a system and one of its component parts as the same "product" for purposes of the economic loss rule when the plaintiff bargained for the component as a part of, or "fully integrated" with, the system. *Trans States*, 682 N.E.2d at 50 (holding that an airframe and an engine were the same product where the plaintiff had bargained for a fully integrated airplane, not for each component separately). Here, Plaintiffs have not alleged that they had any use for the rebuilt engine other than to operate the Peterbilt as a fully-integrated system. *Cf. Mars*, 763 N.E.2d at 438 (steel frame and warehouse were the same product in economic loss doctrine analysis because plaintiff had no use for the frame other than as part of the warehouse). Thus, the Peterbilt and its engine are the same product for *Moorman* purposes.

9

confined to the defective product itself); *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428, 436 (Ill. App. Ct. 2002) ("Simply put, a product that damages only itself cannot be the subject of a suit for damages."). Because Plaintiffs' negligence claim is predicated only on damage to the Peterbilt itself, the property-damage exception does not apply.[7] Accordingly, the economic loss doctrine bars Plaintiffs' negligence claim, and GAC's motion to dismiss this claim is granted. Count II of Plaintiffs' Second Amended Complaint is dismissed without prejudice.

C. **Negligent Misrepresentation Claim**

GAC argues, and the Court agrees, that the economic loss rule bars Plaintiffs' negligent misrepresentation claim, as well. Plaintiffs simply state in response that the economic loss rule does not apply to this case, which is unavailing for the reasons stated above. Moreover, GAC points out (and Plaintiffs do not contest) that the information-provider exception to the economic loss rule, which permits claims for economic loss caused by negligent misrepresentation if the defendant is "in the business of supplying information for the guidance of others in their business transactions," *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 335 (Ill. 2006), does not apply here because the end result of GAC's relationship with Plaintiffs was the delivery of a tangible product: a functioning Peterbilt truck. *See Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1202 (Ill. 1997) (defendant is not an information provider for purposes of the economic loss doctrine if the information provided is "incidental to a tangible product");

---

[7] To fall under the property-damage exception to the economic loss doctrine, Illinois law also requires the event that caused the damage to have been the result of a "sudden or dangerous occurrence" such as a fire, explosion, or other destructive event. *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 706–07 (N.D. Ill. 2016) (quoting *Trans States*, 682 N.E.2d at 48). Nowhere in Plaintiffs' complaint is there any reference to such an event. Therefore, while superfluous in light of the fact that Plaintiffs have not shown any damage to property other than the Peterbilt itself, this rule provides an independent ground for the Court's conclusion that Plaintiffs' negligence claim is barred by the economic loss doctrine.

*Stewart Title Guar. Co. v. Inspection & Valuation Int'l, Inc.*, No. 12 C 08918, 2013 WL 5587293, at *6 (N.D. Ill. Oct. 10, 2013) (renovation of hotel produced tangible product). The negligent misrepresentation claim (Count IV) is dismissed without prejudice as well.

D.  **Breach of Implied Warranty Claim**

Next up is Plaintiffs' breach of implied warranty claim. GAC moves to dismiss this claim on grounds that Illinois law does not recognize a breach of implied warranty claim for "workmanlike performance"[8] in the context of automotive repair services. As GAC sees it, under Illinois law there are only two implied-at-law warranties: the warranty of habitability for residential real estate sales and leases, and the warranty of workmanlike performance for construction services. In disagreement, Plaintiffs contend that Illinois courts have recognized an implied warranty of workmanlike performance for repair services in the past, citing *Board of Managers of Winston Towers No. 4 Condominium Ass'n v. Westinghouse Elec. Corp.* ("*Winston Towers*"), No. 92 C 0478, 1992 WL 168786 (N.D. Ill. July 13, 1992).

In *Winston Towers*, a condominium association sued an elevator company for breach of implied warranty (among other things) in connection with the company's alleged failure to maintain the elevators in the condominium building. *Id.* at *1. The elevator company moved to dismiss the breach of implied warranty claim on grounds that Illinois does not recognize such a claim for services. Rejecting this argument, the court cited *Altevogt v. Brinkoetter*, 421 N.E.2d 182 (Ill. 1981), for the proposition that "a service contract may carry an implied undertaking" to

---

[8] This somewhat antiquated term means "'a proper, safe, and non-negligent way of doing something . . . the breach of which standard is equivalent to negligence.'" *StarNet Ins. Co. v. Ruprecht*, 3 F.4th 342, 347 (7th Cir. 2021) (quoting *Sheldon Livestock Co. v. W. Engine Co.*, 301 N.E.2d 485, 488 (Ill. App. Ct. 1973)).

perform the services in a reasonably workmanlike manner. *Winston Towers*, 1992 WL 168786, at *4 (quoting 421 N.E.2d at 186).

The Court respectfully declines to adopt *Winston Towers*'s expansive view of the scope of warranty claims in service contracts. Specifically, the Court disagrees with *Winston Towers* that *Altevogt* stands for the proposition that *all* services contracts contain an implied term requiring the work to be performed in a "workmanlike" manner. *Altevogt* involved a residential construction contract. 421 N.E.2d at 186. The language in *Altevogt* on which *Winston Towers* relies appears to be limited to that context,[9] and all of the cases that *Altevogt* cites for that rule involve construction contracts or habitability defects. *See Econ. Fuse & Mfg. Co. v. Raymond Concrete Pile Co.*, 111 F.2d 875, 877 (7th Cir. 1940); *Dean v. Rutherford*, 364 N.E.2d 625, 626–27 (Ill. App. Ct. 1977); *Georgetown Twp. High Sch. Dist. No. 218 v. Hardy*, 349 N.E.2d 88, 89 (Ill. App. Ct. 1976). And as GAC has noted in its reply brief, another court has disagreed with *Winston Towers* on this point, on very similar grounds. *See Am. Labelmark Co. v. Akiyama Corp. of Am.*, No. 93 C 3208, 1993 WL 460838, at *2 and *2 n.1 (N.D. Ill. Nov. 5, 1993) (holding that Illinois law does not recognize an implied warranty of workmanlike performance that is generally applicable to all service contracts, and finding *Winston Towers* unpersuasive because "the cases cited by the Supreme Court in [*Altevogt*] do not support [*Winston Towers*'s] interpretation" because they "all deal with either construction or residential habitability issues").

---

9   The entire passage from *Altevogt* reads:

> A contract to construct a building is a contract to render services, and courts applying Illinois law have recognized that such a contract may carry an implied undertaking that the various jobs of which the overall construction is composed will be performed in a reasonably workmanlike manner.

421 N.E.2d at 186.

Moreover, "[a] federal court sitting in diversity must proceed with caution in making pronouncements about state law," because such pronouncements "inherently involve a significant intrusion on the prerogative of the state courts to control that development." *REXA, Inc. v. Chester*, 42 F.4th 652, 668 (7th Cir. 2022) (quoting *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092 (7th Cir. 1999)). The Court is therefore reluctant to expand the contours of liability for breach of implied warranty for services beyond the limited contexts in which Illinois courts have explicitly recognized it. *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1034 (7th Cir. 2005) (citing reluctance of federal courts sitting in diversity to "expand state law"); *Home Valu Inc. v. Pep Boys*, 213 F.3d 960, 965 (7th Cir. 2000) (when resolving an unsettled question of state law, courts "generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability" (citation and internal quotation marks omitted)). As the Seventh Circuit has pointedly observed, "a plaintiff who needs a common law departure or innovation to win should bring his suit in state court rather than in federal court." *Great Cent. Ins. Co. v. Ins. Servs. Office, Inc.*, 74 F.3d 778, 786 (7th Cir. 1996) (declining, in the absence of convincing evidence, to "predict that the Supreme Court of Illinois . . . would recognize (more realistically, would create)" a new source of tort liability). Accordingly, Plaintiffs' breach of implied warranty claim (Count III) is dismissed without prejudice.

**E.  ICFA Claim**

Plaintiffs' last claim arises under the ICFA, "a regulatory and remedial statute intended to protect consumers [] against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)) (internal quotation marks omitted). An ICFA plaintiff "must plead and prove that the defendant committed

13

a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019).

There are two theories of liability under the ICFA: deceptive practices and unfair conduct. *See Benson*, 944 F.3d at 646. Because Plaintiffs bring a deceptive practices claim, they must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires them to plead the fraudulent conduct with "particularity" by "identify[ing] the 'who, what, when, where, and how' of the alleged fraud." *Id.* (quoting *Vanzant*, 934 F.3d at 738).

Plaintiffs allege that GAC made two intentional misrepresentations. First, they claim that, when they dropped off the Peterbilt in October 2020, Cecati intentionally misrepresented that the repairs would be complete by the end of November. (Compl. ¶¶ 249–53.) Second, Plaintiffs allege that, when they picked the Peterbilt up in January 2021, GAC knowingly misled them by assuring them that the Peterbilt was repaired. (*Id.* ¶ 259.)

GAC solely argues that the ICFA claim must be dismissed because both of these allegations are grounded in GAC's alleged failure to fulfill its contractual promises to Plaintiffs. GAC is correct that a "mere breach of contract" is insufficient to show a violation of the ICFA. *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 322 (7th Cir. 2021) (quoting *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 822 (7th Cir. 2018)) (internal quotation marks omitted). An ICFA claim instead requires a "stand-alone [] fraudulent act or practice," *id.* at 323 (quoting *Cmty. Bank of Trenton*, 887 F.3d at 822) (internal quotation marks omitted), that "involves more than the mere fact that a defendant promised something and then failed to do it." *Id.* at 324 (quoting *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005)) (internal quotation marks omitted); *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399–400 (7th Cir. 2011). Put

another way, although the existence of a contract alone does not doom an ICFA claim, *Greenberger*, 631 F.3d at 400, fraud allegations can only survive "in a contractual setting" if the plaintiff can "prove that the defendant deceptive acts or practices distinct from any underlying breach of contract." *Id.* at 399 (citation omitted).

Here, though, Plaintiffs maintain that they never formed a valid contract with GAC. And a dispute over whether a contract exists is typically not resolvable at the pleadings stage. *See Pereida v. Wilkinson*, 141 S. Ct. 754, 765 n.6 (2021) ("It is 'generally a question of fact for the jury whether or not a contract . . . actually exists.'" (quoting 11 R. Lord, Williston on Contracts § 30:3 (4th ed. 2012)); *Arbogast v. Chicago Cubs Baseball Club, LLC*, 194 N.E.3d 534, 542 (Ill. App. Ct. 2021) ("The existence of a contract, its terms, and the parties' intent are questions of fact to be determined by a trier of fact."); *id.* at 544 (affirming trial court's denial of motion to dismiss personal injury claim because of factual disputes concerning plaintiff's agreement to be bound by terms of media license).

Even if the Court were to assume that Plaintiffs' allegations that they paid the $18,989.75 invoice upon picking up the Peterbilt suffice to show that *some* contract existed, the Court cannot determine, on the present record, whether the allegations in support of Plaintiffs' ICFA claim fall within the scope of that contract.[10] As to the claim that Cecati misrepresented to Plaintiffs when they dropped off the Peterbilt in early October that the Peterbilt would be ready by the end of November, it is unclear whether it falls within or outside the parties' contract. Perhaps the contract was formed when Plaintiffs dropped the Peterbilt off in October. In that case, any representations

---

[10] The cases GAC cites are distinguishable in this respect. In all of them, neither party disputed that a contract governed their relationship, nor were there any material factual disputes about the contracts' scope that would call into question whether the conduct challenged under the ICFA was distinct from the parties' contractual obligations.

15

about the timeline for completion could plausibly have fallen within the contract. But it is also possible (and, as an inference in Plaintiffs' favor, accepted as true at this stage) that no valid contract was formed until a later date—perhaps when Plaintiffs received a bottom-line price quote via text in December, or even when they accepted and paid for the invoice upon picking up the Peterbilt in January. Under either of those scenarios, Plaintiffs' ICFA claim would go forward as to the October statement—Cecati's representation could not have been "based on" a contractual promise that did not exist at the time that he made it.

Whether Plaintiffs' second claim—that GAC falsely represented that the Peterbilt was in working order when Plaintiffs picked it up in January—falls within the scope of any contract between the parties also depends on factual issues that the current record cannot answer. In particular, it is not clear whether the absence of any further issues with the Peterbilt was a term of the parties' contract or a unilateral expectation that Plaintiffs never discussed with GAC. Further fact development on this point is needed.

GAC's motion to dismiss rests solely on their contractual argument, so the Court considers any other challenge to the sufficiency of Plaintiffs' ICFA claim waived for purposes of this motion. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003). Accordingly, GAC's motion to dismiss is denied as to the ICFA claim (Count V).

IV.  **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss [27] is granted in part and denied in part. The motion is denied with respect to Plaintiffs' ICFA claim (Count V). In all other respects, the motion is granted, and Counts I through IV of Plaintiffs' Second Amended Complaint are dismissed without prejudice. Plaintiffs have 28 days to file an amended complaint if they so choose.

**SO ORDERED.**                                                       ENTERED: May 3, 2023

_____
**HON. JORGE ALONSO**
**United States District Judge**